April 21, 2017

<u>**Via ECF**</u>

Hon. P. Kevin Castel
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

> Re:    ***Bahr v. PNW Enterprises, LLC*, 16 CV 1223**

Dear Judge Castel:

We represent Plaintiff Mickey Bahr in the above-referenced employment action.  We write in response to Defendant PNW Enterprises, LLC's Letter Motion for Leave to File Motion for Summary Judgment (the "Motion"), dated April 17, 2017.  Plaintiff bring claims against Defendant for (i) failure to pay him at the overtime premium rate for hours worked in excess of 40 in a work week, in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, and the New York Labor Law ("NYLL"), N.Y. Lab. Law §§ 1 *et seq.*; (ii) termination of his employment in retaliation for complaints about Defendant's wage-and-hour violations, in violation of the FLSA and NYLL § 215; and (iii) termination of his employment in retaliation for his complaints about Defendant's health and safety violations, in contravention of the NYLL § 740.

## I.    Facts

Shortly after graduating college, in 2014, Mr. Bahr was hired as a special event performer with PNW, a for-profit company that markets itself as an "enrichment center," offering classes, preschool, camps, birthday parties, and special events for children.  PNW solicits clients through advertising and direct marketing, including cold calls, emails, and newsletters, and social media. In less than a year after his hire, Mr. Bahr ascended to a full-time salaried position as a Location Manager at PNW's Battery Park location, in recognition of his strong work ethic and skills.  In this position, Mr. Bahr was responsible for promoting good client relationships to sell PNW's services; he did not have authority to supervise PNW employees, make hiring or firing decisions, or discipline employees.  PNW's group of executive-level employees, headed by its then-Chief Executive Officer Pamela Wolf, and regional directors, had absolute control over all aspects of PNW's operations. Mr. Bahr's former supervisor even described this position as identical to a sales person at a retail store.  Still, PNW classified the Location Manager position as exempt from overtime laws.  Mr. Bahr regularly worked in excess of 40 hours a week: in addition to his scheduled shift, Mr. Bahr worked during lunch breaks, after his shift, and on weekends, for a total of approximately 50 hours per week.  PNW, however, did not compensate him at the overtime premium rate for hours worked in excess of 40 in a week.

PNW also is a persistent, chronic violator of New York health and safety laws. PNW has been cited, among things, for failing to conduct required background checks, to require proper medical clearances, to maintain fire safety equipment in a proper fashion, and to operate within approved building capacities; for operating without required Department of Health and

Mental Hygiene ("DOHMH") permits; and providing child care service without staff members trained in First Aid/CPR on site. During Mr. Bahr's employment with Defendant, he documented numerous complaints to PNW's supervisors, managers, and executives regarding Defendant's illegal activities, including various health and safety conditions that violated New York state and city rules, laws, and regulations.

On March 19, 2015, Mr. Bahr complained to Ms. Wolf, and PNW's Chief Operating Officer, Gair Morris, that PNW had been operating a childcare facility in Battery Park since 2008 without taking any initiative to acquire required building and fire code approvals. On April 30, 2015, Mr. Morris instructed Mr. Bahr to misrepresent the children's programming PNW was offering to city fire inspectors. On May 15, 2015, Mr. Bahr again brought his concerns regarding compliance to his direct manager, Kimberly Yosslowitz, PNW's Director of Sales. In response, Ms. Yosslowitz threatened Mr. Bahr by stating; "It's never been a problem for any of the previous managers!" On June 16, 2015, Mr. Bahr brought issues regarding the Battery Park location's ventilation to the attention of Ms. Wolf. On July 21, 2015, Mr. Bahr again emailed Mr. Morris regarding the ventilation system. Mr. Morris took no action, and the issue was never fixed, resulting in improper building ventilation, which jeopardized children's health.

In the beginning of August 2015, Mr. Bahr was concerned with various safety issues at PNW, which he believed endangered PNW's minor clients, as well as violated Article 47 of the New York City Health Code, including, but not limited to, operating an unlicensed facility, failure to meet building ventilation requirements, failure to maintain a facility free from rodents, and failure to meet approved means of egress by the New York City Department of Buildings and Department of Health and Mental Hygiene. On August 14, 2015, Mr. Bahr reached out to Mr. Morris to address those matters in a meeting. Shortly thereafter, Mr. Morris admitted to Mr. Bahr that PNW had been operating day care centers without licenses and hiding this fact from the Department of Health by keeping each day care center's address off of the Department of Building's registry. Continuing to try and work with PNW to correct these matters, on August 31, 2015, Mr. Bahr brought the issues to PNW's Director of Compliance, Jennifer Simon, in a detailed memo outlining PNW's numerous health and safety violations citing to specific statutes and regulations, including several violations of Article 47 of the New York City Health Code. The next day, PNW abruptly transferred him to PNW's Tribeca Location, an under-performing and less desirable location, and away from Battery Park, which the violations remained unaddressed.

On September 9, 2015, Mr. Bahr emailed the new Location Manager of the Battery Park location to inform him of his discussion with Ms. Simon, hoping that the issues would be resolved without him. However, PNW did not prioritize compliance with the New York City Health Code. Ms. Simon, as Director of Compliance, told Mr. Bahr, "I have been given instructions to work toward [compliance] but, honestly, it is not high on the list of priorities with so many locations in need." On September 16, 2015, Mr. Bahr contacted several Location Managers from other PNW facilities to engage in a constructive conversation concerning a plan of action to move towards compliance with all state and city regulations. On September 17, 2015, Mr. Bahr attended a meeting with all Location Managers, Ms. Yosslowitz, Ms. Waxler, Mr. Morris, Ms. Simon, and Ms. Wolf. At this meeting, Mr. Bahr again voiced his concerns about the lack of attention to state and city regulations. Ms. Wolf and Mr. Morris ignored these concerns and told him that it was "not his job."

On October 1, 2015, PNW announced that the Location Manager schedule would be extended thirty minutes longer per week, resulting in a 40.5 hour a week schedule. Mr. Bahr complained to his supervisor that this change resulted in a schedule longer than 40 hours a week, but she again did not get back to Mr. Bahr. On the same day, the Fire Department of New York

issued violations to PNW for its failure to comply with various regulations. About a week later, Mr. Bahr learned that, pursuant to Article 17 of New York State Education Law, all public and private schools must comply with several provisions, including conducting fire drills. PNW had not developed any methods to comply with those provisions. Mr. Bahr spoke with Ms. Simon to create a plan so that PNW would comply with this law. Ms. Simon ensured that PNW was creating a plan to address fire drills and would share it with all location managers once it was finalized. However, the new drill procedures still did not comply with the requirements of the New York State Education Law.

About three weeks later, Mr. Bahr was called into a meeting with Ms. Yosslowitz, where she informed him—for the first time in his 22 months as a PNW employee—of apparent performance issues, claiming that Mr. Bahr had been insubordinate, showed a lack or pro-activeness, and a lack of customer service. PNW immediately placed Mr. Bahr on a performance improvement plan because he had "not been positive" towards the topic of "agency compliance" and allegedly "dwells on situations that should not be prioritized," referencing Mr. Bahr's insistence that PNW correct health and safety violations. Mr. Bahr attempted to work with Ms. Yosslowitz to improve his performance by having her explain what we was doing wrong and where he could improve, a dialogue which she quickly ended. As PNW was continuing to ignore health and safety, on November 5, 2015, Mr. Bahr reported PNW's health and safety violations and increasingly reckless disregard of New York law to government agencies by calling 311.

On November 8, 2015, Mr. Bahr notified Ms. Yosslowitz of his reporting, who quickly forwarded the email to Mr. Morris and Ms. Wolf. Ms. Wolf's immediate response was, "What is Mickey angry about? Is he hoping to get fired for some reason?" Three minutes later, she added, "Remove all of Mickeys access to our backend and other company information tonight. The locks should be changed in [the Tribecca Location] after his termination.' Immediately in response, Mr. Morris emailed PNW's Human Resources Department: "We are terminating Mickey tomorrow AM at 7:30. He sent an email this afternoon telling us that he had reported any known DOHMH infractions to 311." Mr. Morris added, "I don't know where or when [Mr. Bahr] became so angry and disgruntled ....[sic] about things that don't even concern him? Does he really believe we have children in unsafe environments?"

Following Mr. Bahr's reporting to Ms. Waxler that he had complained to 311, Mr. Bahr received an email from Ms. Yosslowitz scheduling a meeting with him for the following morning, during which PNW terminated his employment. The reason? A purported "sales deficit." Defendant's proffered reason is pure pretext for discrimination; Mr. Bahr was one of PNW's top Location Managers at the time of his termination. Further, PNW did not follow the two-week timeline of performance review laid out in Mr. Bahr's performance improvement plan, allow Mr. Bahr to complete his discussion of the performance review plan, which PNW always had allowed its other employees, or issue him a one-week written warning of potential termination. Mr. Morris testified that it is PNW's regular practice is to give its employees the opportunity to engage in a back-and-forth with its managers to modify and tailor performance improvement plans until both sides agree to its terms, an opportunity denied to Mr. Bahr.

Ultimately, in November and December 2015, the DOHMH did issu additional violations against PNW based on Mr. Bahr's complaints.

## II.    Legal Argument

Defendant's anticipated motion should be denied as there are genuine disputes of nearly all material facts. If the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, summary judgment is

improper. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At the summary judgment stage, it is the moving party that has the high burden of demonstrating that no genuine issue of material fact exists. *McFarlane v. Chao*, No. 04 Civ. 4871 (GBD)(HBP), 2007 WL 1017604, at \*9 (S.D.N.Y. Mar. 30, 2007) (citing *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 253–54 (2d Cir. 2002)). In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant. *Id.* Here, drawing all inference in Plaintiff's favor, which the Court must, a reasonable jury could return a verdict for Plaintiff, precluding summary judgment.

**A.      The record supports that PNW misclassified the Location Manager position as exempt.**

The record supports the PNW misclassified the Mr. Bahr as exempt, and not under the executive exception. The FLSA[1] must be construed so that its provisions will "have the widest possible impact in the national economy." *Gustafson v. Bell Atl. Corp.*, 171 F. Supp. 2d 311, 324 (S.D.N.Y. 2001). Courts, therefore, must "narrowly construe" its exemptions; an employer invoking an FLSA exemption "bears the burden of proving that its employees fall within the exemption." *Reiseck v. Universal Commc'ns of Miami, Inc.*, 591 F.3d 101, 104 (2d Cir. 2010). Here, Defendant argues that Plaintiff's overtime claim fails because Plaintiff (i) is exempt from overtime pay requirements under the FLSA and NYLL's executive exemption, and (ii) has not established that he worked hours in excess of 40 in a work week. Defendant is incorrect on both counts.

The FLSA's Executive Exemption covers an employee whose primary duty is management of a customarily recognized department of the employer, who customarily and regularly directs the work of two or more employees; and whose suggestions and recommendations as to the hiring, firing, advancement, promotion are given particular weight. 29 C.F.R. §541.100(a). Under the interpretive regulations, an employee's "primary duty" is the duty that consumes a "major part, or over [fifty] percent, of the employee's time." 29 C.F.R. § 541.103; *Reiseck v. Universal Commc'ns of Miami, Inc.*, 591 F.3d 101, 107 (2d Cir. 2010). Here, genuine issues of material fact remain as to whether Plaintiff and other Location Managers were exempt from overtime pay requirements. Plaintiff testified that his primary duty was sales, not executive functions: he had little to no autonomy in his daily work; Defendant explicitly told him that he was not responsible for administration or management; Defendant assigned him responsibilities on a daily basis with detailed instructions that prevented him from exercising any decision-making authority; he did not supervise anyone; and he did not have the authority to hire, fire, or discipline PNW employees, nor is there any indication that his opinion on such matters were given any weight. *See* 29 C.F.R. § 541.205(a) (distinguishing sales duties from exempt duties); *Reiseck*, 591 F.3d at 106 (holding that "promoting sales" did not fall under exemption). Therefore, there is a dispute of material fact as to whether Mr. Bahr falls under the Executive Exemption of the FLSA.

Similarly, the record shows disputes of material fact as to whether Plaintiff worked hours in excess of 40 in a work week. Plaintiff testified concerning the number of weeks he worked, his rate of pay, the hours he worked, what he was actually paid, and Defendant's misclassification of Plaintiff's employment as exempt from overtime pay resulted in his being paid less than the amount to which he was entitled. Plaintiff has therefore established that he regularly worked in excess of 40 hours per week and sufficiently describes the pattern of his overtime, uncompensated work. Further, Plaintiff complained about not being able to take lunch

---

[1] The NYLL tracks the FLSA . *Reiseck v. Universal Commc'ns of Miami, Inc.*, 591 F.3d 101, 107 (2d Cir. 2010); *Wills v. RadioShack Corp.*, 981 F. Supp. 2d 245, 248 (S.D.N.Y. 2013).

breaks and that Defendant's new schedule resulted in a work week longer than 40 hours; as such, Defendant knew Plaintiff was working hours in excess of 40 in a week. Accordingly, Plaintiff has raised genuine disputes of material fact regarding his FLSA and NYLL unpaid overtime claims, making summary judgment inappropriate.

**B.      Plaintiff's retaliation claims under the FLSA and NYLL §§ 215,[2] 740 are likewise subject to disputes of material fact.**

Defendant argues that Plaintiff's retaliation claims fail because (i) concerning Plaintiff's NYLL § 740 claim, "discovery has revealed that each of the health and/or safety violations that Bahr claims to have alerted the authorities to, were already known by the authorities and were being actively addressed by NYKC," and (ii) Plaintiff "fails to refute that he was terminated as a result of performance issues and customer complaints."

To sustain a retaliation claim under NYLL § 740, a plaintiff need only show that he reported or threatened to report an employer's activity, policy, or practice that violated a law, rule, or regulation, *Webb-Weber v. Cmty. Action for Human Servs., Inc.*, 23 N.Y.3d 448, 452 (2014), which "creates and presents a substantial and specific danger to the public health and safety," *Remba v. Fed'n Employment & Guidance Serv.*, 76 N.Y.2d 801, 802 (1990). Here, both Plaintiff and Defendants' CEO and COO have testified that Mr. Bahr complained repeatedly about violations of health and safety laws, including PNW's not having the required number of exits for a childcare facility, failing to improve the poor ventilation, and refusing to correct rodent problem, all of which present "a substantial and specific danger to the public health and safety." It cannot seriously be challenged that these violations of a statutory scheme intended to prevent harm to children did not create and present a substantial and specific danger to the public health and safety. *See Villarin v. Rabbi Haskel Lookstein Sch.*, 96 A.D.3d 1, 7, 942 N.Y.S.2d 67, 72 (1st Dep't App. Div. 2012) ("there is no requirement that there be a ... *large-scale* threat, or multiple potential or actual victims [;] ... [rather] a threat to any member of the public might well be deemed sufficient").

Further, contrary to Defendant's contention, it is irrelevant whether PNW already knew about the complained-of violations; Defendant does not cite a single authority stating that a Defendant's professed knowledge of a violation precludes a § 740 claim.

Finally, it is a material dispute of fact whether Plaintiff was terminated because of improper retaliation or another reason. It is well known that summary judgment is "ordinarily inappropriate" in unlawful termination cases, where the employer's intent and state of mind are in dispute. *McFarlane v. Chao*, No. 04CV4871(GBD)(HBP), 2007 WL 1017604, at *9 (S.D.N.Y. Mar. 30, 2007) (citing *Carlton v. Mystic Transp.*, Inc., 202 F.3d 129, 134 (2d Cir. 2000)). Here, a jury could infer retaliatory intent from emails between Defendant's CEO and other executives asking if Plaintiff was "hoping to get fired" upon learning of Plaintiff's complaints of health and safety violations, as well as the temporal proximity between Plaintiff's complaints and his termination. Further, the record does not support Defendant's proffered legitimate non-discriminatory reason—that he was fired due to poor sales—as neither PNW's CEO or COO could agree to any single metric by which to even accurately compare Location Manager's sales records. As such, summary judgment is inappropriate.

---

[2] Defendant does not provide any analysis of the merits of FLSA and NYLL § 215 claims.

Hon. P. Kevin Castel
April 21, 2017
Page 6 of 6


        Accordingly, Plaintiff has raised triable issues of fact precluding summary judgment, and
Defendant's Motion should be denied.

        Thank you for Your Honor's time and attention to this matter.


                                        Respectfully submitted,


                                        Walker G. Harman, Jr.


cc:      Lloyd J. Weinstein (via ECF)